**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH MUN, Derivatively On Behalf Of ACETO CORPORATION, <br><br>              Plaintiff, <br><br>      v. <br><br> WILLIAM C. KENNALLY III, ALBERT L. EILENDER, VIMAL KAVURO, WILLIAM N. BRITTON, NATASHA GIORDANO, ALAN G. LEVIN, DANIEL B. YAROSH, SALVATORE GUCCIONE, and DOUGLAS ROTH, <br><br>          Defendants, <br><br>     and <br><br> ACETO CORPORATION, <br><br>         Nominal Defendant. | Case No. 2:18-cv-5788 <br><br> **VERIFIED SHARHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Joseph Mun ("Plaintiff"), by and through his undersigned attorneys, brings this action derivatively on behalf of nominal defendant Aceto Corporation ("Aceto" or the "Company"), and alleges upon personal knowledge as to himself and his own acts and, as to all other matters, based upon the investigation conducted by his attorneys, which included, among other things, a review of filings with the Securities and Exchange Commission ("SEC") and in the Securities Action (as defined below), analyst reports, press releases, and other publicly available information regarding the Company.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of and for the benefit of nominal defendant Aceto, against certain of its officers and members of the Company's

Board of Directors (the "Board") for breaches of their fiduciary duties and other violations of law that occurred from August 25, 2017 through April 18, 2018 (the "Relevant Period").

2.      Aceto markets, sells, and distributes human health products, pharmaceutical ingredients, and performance chemicals.  The Company offers finished dosage form generics, nutritionals, pharmaceutical intermediates, active pharmaceutical ingredients, specialty chemicals, and agricultural protection products.

3.      Throughout the Relevant Period, the Individual Defendants (defined below) made materially false and misleading statements regarding the Company's business, operational, and compliance policies.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that:  (i) due to undisclosed competitive and pricing pressures, Aceto was unlikely to meet the performance metrics the Company provided to its investors as financial guidance; (ii) accordingly, Aceto's financial guidance was overstated; and (iii) as a result of the foregoing, Aceto's financial statements and Defendants' statements about Aceto's business, operations, and prospects, were materially false and misleading at all relevant times.

4.      On April 18, 2018, after the market closed, Aceto disclosed that "the financial guidance issued on February 1, 2018, should no longer be relied upon," and suspended "further financial guidance for at least the balance of the fiscal year."   Aceto also disclosed that "the Company anticipates recording non-cash intangible asset impairment charges, including goodwill, in the range of $230 million to $260 million on certain currently marketed and pipeline generic products as a result of continued intense competitive and pricing pressures."

5.      Aceto additionally announced that it was negotiating with its lenders for a waiver of its credit agreement regarding certain of its financial covenants due to adverse conditions in the generics market.

6.      Lastly, Aceto disclosed the resignation of its Chief Financial Officer ("CFO"), Edward Borkowski ("Borkowski"), who had joined the Company just two months earlier.

7.      As a result of the Company's disclosures, Aceto's stock price fell $4.74 per share, or 64%, to close at $2.66 per share on April 19, 2018.

8.      The news on April 18, 2018 took investors and the public by surprise.  Less than three months prior, Aceto predicted a non-GAAP profit of $1 to $1.05 per share – a number that stands in stark contrast to the news that Aceto may breach debt covenants.

9.      The Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully engaging in the wrongdoing alleged herein.

10.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Aceto has sustained damages as described below.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1931(b) because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have

received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### *Plaintiff*

14.     Plaintiff is a stockholder of Aceto, was a shareholder of Aceto at the time of the wrongdoing alleged herein, and has been a shareholder of Aceto continuously since that time. Plaintiff will fairly and adequately represent the interest of Aceto's shareholders in enforcing the rights of the Company.  Plaintiff is a citizen of Illinois.

### *Nominal Defendant*

15.     Nominal Defendant Aceto is a New York corporation and maintains its principal executive offices at 4 Tri Harbor Court, Port Washington, NY 11050.  Aceto is engaged in the development, marketing, sales, and distribution of generic pharmaceuticals, pesticides, and other chemical products.  The Company has business operations in ten countries and is organized into three principal segments: Human Health, Pharmaceutical Ingredients, and Performance Chemicals.

### *Director Defendants*

16.     Defendant William C. Kennally III ("Kennally") has served as the Company's President and Chief Executive Officer ("CEO") since October 2, 2017, and has served as a member of the Board since 2016.  Kennally is a citizen of Pennsylvania.

17.     Defendant Albert L. Eilender ("Eilender") has been the Chairman of the Board since October 2009.  He joined the Board in 2000, was the lead independent director from 2005 to September 2009, and served as CEO of the Company from September 2010 to January 2013. Eilender is a citizen of Florida.

18.     Defendant Vimal Kavuro ("Kavuro") has served as a member of the Board since 2017.  Kavuro is a citizen of New Jersey.

19.     Defendant William N. Britton ("Britton") has served as a member of the Board since 2006, and at all relevant times has been Chairman of the Audit & Risk Committee (the "Audit Committee") and member of the Nominating and Governance Committee.  Upon information and belief, Britton is a citizen of New Jersey.

20.     Defendant Natasha Giordano ("Giordano") has served as a member of the Board since 2011 and at all relevant times served as Chairman of the Compensation Committee. Giordano is a citizen of New Jersey.

21.     Defendant Alan G. Levin ("Levin") has served as a member of the Board since 2013 and at all relevant times has served chairman of the Nominating and Governance Committee and member of the Audit Committee.  Levin is a citizen of Connecticut.

22.     Defendant Daniel B. Yarosh ("Yarosh") has served as a member of the Board since 2014 and at all relevant times served as a member of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee.  Yarosh is a citizen of New York.

23.     Defendants Kennally, Eilender, Kavuro, Britton, Giordano, Levin, and Yarosh are referred to collectively as the "Director Defendants."

*Officer Defendants*

24.     Defendant Douglas Roth ("Roth") served as Senior Vice President and CFO from March 2010 until his retirement on March 31, 2018.  Roth is a citizen of New York.

25.     Defendant Salvatore Guccione ("Guccione") served as the CEO and President of Aceto from January 2, 2013 to September 27, 2017 and from December 01, 2011 to September 27, 2017, respectively.  Guccione is a citizen of New Jersey.

26.     Defendants Roth, Guccione, and the Director Defendants are referred to collectively as the "Individual Defendants."

## **DUTIES OF THE INDIVIDUAL DEFENDANTS**

27.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, directly and/or indirectly, exercised control over the wrongful acts complained of herein.

29.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.   By virtue of such duties, the officers and directors of Aceto were required to, among other things:

        a.     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      Remain informed about how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

30.      Each Individual Defendant, as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

31.     The Company has also established a Code of Business Conduct and Ethics (the "Code"), in which its officers and directors pledge to:

- promote honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;

- promote full, fair, accurate, timely and understandable disclosure in reports and documents that Aceto files with, or submits to, the Securities and Exchange Commission ("SEC") and in other public communications made by Aceto;

- promote compliance with applicable laws and governmental rules and regulations and the listing rules of the NASDAQ Stock Market, Inc. ("NASDAQ");

- promote the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code;

- promote accountability for adherence to this Code;

- ensure the protection of Aceto's legitimate business interests, including corporate opportunities, assets and confidential information; and

- deter wrongdoing.

32.     The Code further states:

**<u>Honest and Candid Conduct</u>**

Each director, officer and employee owes a duty to ACETO to act with integrity. Integrity requires, among other things, being honest and candid. Deceit and subordination of principle are inconsistent with integrity. Each director, officer and employee must:

- Act with integrity, including being honest and candid while still maintaining the confidentiality of information where required or consistent with ACETO's policies;

- Observe both the form and spirit of laws and governmental rules and regulations, accounting standards, SEC rules and regulations and ACETO policies; and

- Adhere to a high standard of business ethics.

## Raising Ethical Issues

Maintaining ethical standards, including appropriate disclosure and internal accounting controls, is the responsibility of every member of the Aceto family. Early identification and resolution of the ethical issues that may arise are critical to maintaining our commitment to world-class business practices.

## Aceto's Disclosure Process

Each director, officer or employee involved in Aceto's disclosure process is required to be familiar with and comply with Aceto's disclosure controls and procedures and internal control over financial reporting, to the extent relevant to his or her area of responsibility, so that Aceto's public reports and documents filed with the SEC comply in all material respects with the applicable federal securities laws and SEC rules and regulations. In addition, each such person having direct or supervisory authority regarding these SEC filings or Aceto's other communications (including public communications) concerning its general business, results, financial condition and prospects should, to the extent appropriate within his or her area of responsibility, consult with other Aceto officers and employees and take other appropriate steps regarding these disclosures with the goal of making full, fair, accurate, timely and understandable disclosure.

Each director, officer or employee who is involved in Aceto's disclosure process and communications must:

- Familiarize himself or herself with the disclosure requirements applicable to Aceto as well as the business and financial operations of Aceto.

- Not knowingly misrepresent, or cause others to misrepresent, facts about Aceto to others, whether within or outside Aceto, including to Aceto's independent registered public accounting firm, governmental regulators and self-regulatory organizations.

- Properly review and critically analyze proposed disclosure and communications for accuracy and completeness (or, where appropriate, delegate this task to others).

## Regulatory Compliance

Aceto is subject to a variety of federal, state and local regulations that are enforced by numerous agencies. These agencies include the Food and Drug Administration, the Environmental Protection Agency, the Occupational Safety and Health Administration, the Department of Transportation, the Securities and Exchange Commission and the Bureau of Customs and Border Protection. Aceto depends on every employee to uphold the Company's regulatory reputation. Whenever an employee has any concerns about regulatory compliance, he or she

should immediately inform a supervisor, the Regulatory Department or the Genera Counsel's office.

33.     Finally, the Audit Committee Charter (the "Charter") states that the primary

purpose of the Audit Committee of the Board (defendants Britton, Levin and Yarosh) is to:

> Assist the Board of Directors of ACETO Corporation ("Company") in performing its oversight responsibilities with respect to the financial management and internal and external reporting of the Company. These responsibilities include reviewing the financial information which will be provided to the Company's shareholders and others, the quality of the Company's accounting policies and reporting practices, the systems of internal disclosure controls which management and the Board of Directors have established, compliance with the Company's Code of Business Conduct and Ethics, and the internal and external audit processes.  The Committee is to assist the Board in maintaining compliance by the Company and its subsidiaries with all legal and regulatory requirements.   In addition, the Committee shall assist the Board of Directors in performing its oversight responsibilities relating to the Company's processes and policies with respect to identifying, monitoring, assessing, reporting on, managing and controlling the Company's business and financial risks.

34.     The responsibilities of the Audit Committee according to the Charter include:

**Financial Statement and Disclosure Matters**

The Committee shall:

1.   Review and discuss with management and the independent auditors the annual audited financial statements, including related footnotes and disclosures made in Management's Discussion and Analysis included in any SEC filing and recommend to the Board that the audited financial statements should be included in the Company's Annual Report on Form 10-K.

2.   Review and discuss with management and the independent auditors the Company's quarterly financial statements prior to the filing of its Quarterly Report on Form 10-Q, including the results of the independent auditors' review of the quarterly financial statements.

3.   Discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, as amended by Statement on Auditing Standards No. 99, relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

4.      Discuss with management and the independent auditors significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls including information technology security and control and any special steps adopted in light of material control deficiencies, if any.

5.      Review and discuss quarterly reports from the independent auditors on: (i) all critical accounting policies and practices to be used; (ii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; and (iii) other material written communications between the independent auditors and management, such as any schedule of unadjusted differences.

6.      Discuss with management the Company's earnings press releases including the use of "pro forma" or adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies

7.      Discuss with management and the independent auditors the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements, if any.

8.      Review disclosures, if any, made to the Audit & Risk Committee by the Company's CEO and CFO during their certification process for the Company's Annual Report on Form 10-K and Quarterly Report on Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

**Oversight of the Company's Relationship with the Independent Auditor**

The Committee shall:

1.      Review and evaluate the lead partner of the independent auditor team.

2.      Obtain and review a report from the independent auditor at least annually regarding (i) the independent auditors' internal quality-control procedures, (ii) any material issues raised by the most recent internal quality-control review, or peer review (including any findings by the Public Company Accounting Oversight Board ("PCAOB")), of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out

by the firm, (iii) any steps taken to deal with any such issues, and (iv) all relationships between the independent auditor and the Company. Evaluate the qualifications, performance and independence of the independent auditor, including considering whether the auditor's quality controls are adequate and the provisions of the permitted non-audit services is compatible with maintaining the auditor's independence, taking into account the opinions of management. The Audit & Risk Committee shall present its conclusions with respect to the independent auditor to the Board.

3.      Ensure that the independent auditors provide information to the Audit & Risk Committee about the independent auditors' independence and affirm its independence, all in accordance with PCAOB Rule 3526, the Exchange Act and the requirements of NASDAQ.

4.      Oversee the rotation of the audit partners as required by law.

5.      Meet with the independent auditor to discuss the planning and staffing of the audit.

6.      Approve guidelines for the Company's hiring of former employees of the independent auditors, which shall meet the requirements of applicable law and listing standards.

7.      Review the status and functioning of the Company's internal audit function. The internal auditor will functionally report directly to the Audit & Risk Committee. The Committee and the Chief Financial Officer will jointly recommend any compensation or title changes planned for the Company's executive responsible for the internal audit, as well as approve decisions regarding the appointment and removal of the executive responsible for the internal audit. The Committee will ensure there are no unjustified restrictions or limitations, and review and concur in the appointment, replacement, or dismissal of the executive responsible for internal audit. Internal auditors will exhibit the highest level of professional objectivity in gathering, evaluating, and communicating information about the activity or process being examined. Internal auditors will make a balanced assessment of all the relevant circumstances and not be unduly influenced by their own interests or by others in forming judgments. The scope of internal auditing encompasses, but is not limited to, the examination and evaluation of the adequacy and effectiveness of the organization's governance, risk management, and internal controls as well as the quality of performance in carrying out assigned responsibilities to achieve the organization's stated goals and objectives. The Company's executive responsible for the internal audit will periodically report to senior management and the Committee on the internal audit activity's purpose, authority, and responsibility, as well as performance relative to its plan. Reporting will also include significant risk exposures and control issues, including fraud risks, governance issues, and

other matters needed or requested by senior management and the Committee.

8.      The Committee shall review with management the Company's policies and procedures with respect to officers' expense accounts and perquisites, including their use of corporate assets, and consider the results of any review of these areas by the internal auditor or the independent auditors.

**Oversight Responsibilities Relating to Processes and Policies Regarding Risk**

The Committee shall:

1.      Oversee, review, monitor and assess (including through regular reports by, and discussions with, members of management, and other management individuals responsible for managing risk) the Company's processes and policies for risk identification, risk assessment, risk tolerance, reporting on risk, risk management and risk control (including with respect to risks arising from the Company's compensation policies and practices and in connection with the business and operations of its subsidiaries) and the steps that management has taken to manage the risk function.

2.      Discuss with members of management, and other management individuals responsible for managing risk, the balancing of risk versus reward to the Company (including with respect to risks arising from the Company's compensation policies and practices and in connection with the business and operations of its subsidiaries).

3.      Discuss with members of management and other management individuals responsible for managing risk, areas of specific risk identified by management and/or the Committee (including with respect to risks arising from the Company's compensation policies and practices and in connection with the business and operations of its subsidiaries).

## SUBSTANTIVE ALLEGATIONS

### A.      Company Background

35.      Aceto markets, sells, and distributes human health products, pharmaceutical ingredients, and performance chemicals.  The Company offers finished dosage form generics, nutritionals, pharmaceutical intermediates, active pharmaceutical ingredients, specialty chemicals, and agricultural protection products.  Aceto's securities trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "ACET."

**B.**     **The Individual Defendants Cause the Company to Issue False and Misleading Statements**

36.     The Relevant Period begins on August 25, 2017, when Aceto filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended June 30, 2017 ("2017 10-K"), which was signed by defendants Guccione, Roth, Eilender, Kavuru, Britton, Giordano, Levin, Yarosh, and Kennally, and signed and certified under the Sarbanes Oxley Act of 2002 ("SOX") by Guccione and Roth.  In the 2017 10-K,  Aceto stated in pertinent part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as that term is defined in Rule 13a-15(f) under the Exchange Act. Under the supervision and with the participation of our management, including our principal executive and principal financial officers, we assessed, as of June 30, 2017, the effectiveness of our internal control over financial reporting.  This assessment was based on criteria established in the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on our assessment using those criteria, management concluded that our internal control over financial reporting as of June 30, 2017, was effective.***

> As discussed in Note 3 — Business Combinations, to our Consolidated Financial Statements, on December 21, 2016, wholly owned subsidiaries of Rising Pharmaceuticals, Inc. ("Rising"), a wholly owned subsidiary of Aceto, completed the acquisition of certain generic products and related assets of entities formerly known as Citron Pharma LLC and its affiliate Lucid Pharma LLC. Rising formed two subsidiaries to consummate the product acquisition – Rising Health, LLC (which acquired certain products and related assets of Citron) and Acetris Health, LLC (which acquired certain products and related assets of Lucid).  The scope of our evaluation did not include specific processes or transactions unique to Rising Health and Acetris Health since Rising Health and Acetris Health have not been integrated into our internal control systems as of June 30, 2017.  We are continuing the integration of Rising Health and Acetris Health into our internal control systems and will include their specific processes and transactions in our fiscal year 2018 evaluation of the effectiveness of internal control over financial reporting.  Rising Health and Acetris Health's assets, which were excluded from our internal control evaluation, accounted for 14% of our total assets at June 30, 2017. Rising Health and Acetris Health accounted for 19% of our total net sales for the year ended June 30, 2017.

Our internal control over financial reporting as of June 30, 2017, has been audited by BDO USA, LLP, an independent registered public accounting firm, as stated in its report, which is included herein.

Internal control over financial reporting is defined as a process designed by, or under the supervision of, our principal executive and principal financial officers and effected by our board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, and includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in accordance with U.S. generally accepted accounting principles and that our receipts and expenditures are being made only in accordance with authorization of our management and directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

(Emphasis added).

37.    In the 2017 10-K, Aceto disclosed the following consolidated balance sheets:

**ACETO CORPORATION AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**AS OF JUNE 30, 2017 AND 2016**
(in thousands, except per-share amounts)

| ASSETS | | | | |
|---|---|---|---|---|
| Current assets: | | | | |
| Cash and cash equivalents | $ | 55,680 | $ | 66,828 |
| Investments | | 2,046 | | 881 |
| Trade receivables: less allowance for doubtful accounts (2017, $485; 2016, $513) | | 264,896 | | 167,612 |
| Other receivables | | 10,664 | | 12,650 |
| Inventory | | 136,387 | | 98,107 |
| Prepaid expenses and other current assets | | 3,941 | | 3,339 |
| Deferred income tax asset, net | | 546 | | 3,244 |
| Total current assets | | 474,160 | | 352,661 |
| | | | | |
| Property and equipment, net | | 10,428 | | 10,044 |
| Property held for sale | | 7,152 | | 6,868 |
| Goodwill | | 236,970 | | 67,871 |
| Intangible assets, net | | 285,081 | | 79,071 |
| Deferred income tax asset, net | | 19,453 | | 18,053 |
| Other assets | | 7,546 | | 6,210 |
| | | | | |
| TOTAL ASSETS | $ | 1,040,790 | $ | 540,778 |
| | | | | |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | | | |
| Current liabilities: | | | | |
| Current portion of long-term debt | $ | 14,466 | $ | 197 |
| Accounts payable | | 90,011 | | 46,034 |
| Accrued expenses | | 118,328 | | 52,675 |
| Total current liabilities | | 222,805 | | 98,906 |
| | | | | |
| Long-term debt | | 339,200 | | 118,592 |
| Long-term liabilities | | 61,449 | | 6,344 |
| Environmental remediation liability | | 2,339 | | 3,352 |
| Deferred income tax liability | | 7,325 | | 9,142 |
| Total liabilities | | 633,118 | | 236,336 |
| | | | | |
| Commitments and contingencies (Note 16) | | | | |
| | | | | |
| Shareholders' equity: | | | | |
| Preferred stock, 2,000 shares authorized; no shares issued and outstanding | | - | | - |
| Common stock, $.01 par value, 75,000 shares authorized at June 30, 2017 and June 30, 2016; 30,094 and 29,595 shares issued and outstanding at June 30, 2017 and 2016, respectively | | 301 | | 296 |
| Capital in excess of par value | | 214,198 | | 115,667 |
| Retained earnings | | 198,285 | | 194,804 |
| Accumulated other comprehensive loss | | (5,112) | | (6,325) |
| Total shareholders' equity | | 407,672 | | 304,442 |
| | | | | |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ | 1,040,790 | $ | 540,778 |

38.     On September 27, 2017, Aceto abruptly announced that defendant Guccione was resigning as President and CEO of the Company effective immediately.

39.     On November 3, 2017, Aceto filed a Form 8-K with the SEC ("November 2017 8-K") which disclosed that the Company's previously issued financial statements should not be relied upon and revealed that the Company identified a material weakness in internal control over financial reporting:

> Item 4.02 Non-Reliance on Previously Issued Financial Statement or a Related Audited Report or Completed Interim Review. The Registrant has identified and recorded an adjustment related to the misapplication of cash in the year ended June 30, 2015. The correction resulted in a $4.0 million decrease to trade receivables as of June 30, 2015, a $1.4 million increase to other receivables as of June 30, 2015 and a $4.0 million reduction in net sales for the year ended June 30, 2015. The Registrant has performed a qualitative and quantitative analysis of this misapplication and has determined that it is not material to fiscal year 2015. The Registrant expects to file an amendment (the "10-K Amendment") to its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 10-K") to reflect this matter.

> A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. After discussion with the Registrant's Audit Committee and BDO USA, LLP, the Registrant's independent registered accounting firm ("BDO"), the Registrant has determined that the above-mentioned adjustment demonstrated that there was a material weakness in the design and effectiveness of the Registrant's internal control over financial reporting in that the Registrant's system of internal control did not generate a report that could be used by management to assure that the aging of trade receivables was accurate. The Registrant believes that it has remediated the underlying causes of this material weakness, as will be more fully described in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2017. The Company will continue to monitor and test the remediation to ensure its effectiveness.

> ***After further discussion with the Registrant's Audit Committee and BDO on November 1, 2017 and November 2, 2017, the Registrant has also determined that because of the existence of the above-mentioned material weakness as of June 30, 2017, the Management's Report on Internal Control over Financial Reporting (the "Management's Report") and the related Report of Independent Registered Accounting Firm on internal control over financial reporting (the "BDO Internal Control Report") included in the 2017 10-K should no longer be relied upon. In the 10-K Amendment, the Management's Report and the BDO***

*Internal Control Report will be amended to refer to the above-mentioned material weakness.*

(Emphasis added).

40. However, instead of revealing the complete truth, on November 9, 2017, Aceto filed an amendment to the 2017 10-K on a Form 10-K/A with the SEC ("2017 Amended 10-K"). In the 2017 Amended 10-K, the Company stated in relevant part:

> As previously reported in a Form 8-K filed on November 3, 2017, Aceto Corporation (the "Company," "we," "us," or "our") has identified and recorded an adjustment related to the misapplication of cash in the fiscal year ended June 30, 2015. The correction resulted in a $4,007 decrease to trade receivables as of June 30, 2015, 2016 and 2017, a $1,402 increase to other receivables as of June 30, 2015, 2016 and 2017, a $4,007 reduction in net sales for the year ended June 30, 2015 and a $2,605 reduction in net income for the year ended June 30, 2015. We have performed a qualitative and quantitative analysis of this misapplication and have determined that it is not material to fiscal year 2015.
>
> A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. Also as previously reported, after discussion with the Company's Audit Committee and BDO USA, LLP ("BDO"), the Company's independent registered accounting firm, the Company determined that the above-mentioned adjustment demonstrated that there was a material weakness in the design and effectiveness of our internal control over financial reporting, in that our system of internal control did not generate a report that could be used by management to assure that precision in the review of the aging of trade receivables was adequate. As a result of this material weakness, a reasonable possibility existed that a material misstatement in trade receivables in our annual or interim financial statements could occur and not be prevented or detected on a timely basis.
>
> We are filing this Amendment No. 1 on Form 10-K/A (this "Amendment") to our annual report on Form 10-K for the fiscal year ended June 30, 2017, which was originally filed on August 25, 2017 (the "Original Filing"), in order to:
>
> • amend Item 1A, "Risk Factors", to modify our risk related to internal controls to refer to the above-mentioned material weakness;
>
> • amend Item 8, "Financial Statements and Supplementary Data" for the change in the Report of Independent Registered Public Accounting Firm, in relation to the independent registered public accounting firm's report on our internal control over financial reporting;

- make revisions for immaterial errors in the consolidated financial statements previously issued in the Original Filing relating to the corrections noted in the first paragraph of this Explanatory Note, in Item 1, "Business", Item 6, "Selected Financial Data", Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 8, "Financial Statements and Supplementary Data"; and

- amend Item 9A, "Controls and Procedures" with respect to (i) our conclusions regarding the effectiveness of our disclosure controls and procedures and our internal control over financial reporting and (ii) BDO's related attestation report due to the material weakness described above identified subsequent to the issuance of our Original Filing.

As required by Rule 12b-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), new certifications of our principal executive officer and principal financial officer are also being filed as exhibits to this Amendment. Similarly, revised XBRL exhibits are being filed as exhibits to this Amendment. As a result, Item 15, "Exhibits, Financial Statement Schedules", has also been modified.

41.     In the 2017 Amended 10-K, Aceto disclosed the following consolidated balance sheets:

**ACETO CORPORATION AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**AS OF JUNE 30, 2017 AND 2016**
(in thousands, except per-share amounts)

| | | 2017 | | 2016 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 55,680 | $ | 66,828 |
| Investments | | 2,046 | | 881 |
| Trade receivables: less allowance for doubtful accounts (2017, $485; 2016, $513) | | 260,889 | | 163,605 |
| Other receivables | | 12,066 | | 14,052 |
| Inventory | | 136,387 | | 98,107 |
| Prepaid expenses and other current assets | | 3,941 | | 3,339 |
| Deferred income tax asset, net | | 546 | | 3,244 |
| Total current assets | | 471,555 | | 350,056 |
| | | | | |
| Property and equipment, net | | 10,428 | | 10,044 |
| Property held for sale | | 7,152 | | 6,868 |
| Goodwill | | 236,970 | | 67,871 |
| Intangible assets, net | | 285,081 | | 79,071 |
| Deferred income tax asset, net | | 19,453 | | 18,053 |
| Other assets | | 7,546 | | 6,210 |
| | | | | |
| TOTAL ASSETS | $ | 1,038,185 | $ | 538,173 |
| | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Current portion of long-term debt | $ | 14,466 | $ | 197 |
| Accounts payable | | 90,011 | | 46,034 |
| Accrued expenses | | 118,328 | | 52,675 |
| Total current liabilities | | 222,805 | | 98,906 |
| | | | | |
| Long-term debt | | 339,200 | | 118,592 |
| Long-term liabilities | | 61,449 | | 6,344 |
| Environmental remediation liability | | 2,339 | | 3,352 |
| Deferred income tax liability | | 7,325 | | 9,142 |
| Total liabilities | | 633,118 | | 236,336 |
| | | | | |
| Commitments and contingencies (Note 16) | | | | |
| | | | | |
| Shareholders' equity: | | | | |
| Preferred stock, 2,000 shares authorized; no shares issued and outstanding | | - | | - |
| Common stock, $.01 par value, 75,000 shares authorized at June 30, 2017 and June 30, 2016; 30,094 and 29,595 shares issued and outstanding at June 30, 2017 and 2016, respectively | | 301 | | 296 |
| Capital in excess of par value | | 214,198 | | 115,667 |
| Retained earnings | | 195,680 | | 192,199 |
| Accumulated other comprehensive loss | | (5,112 | | (6,325 |
| Total shareholders' equity | | 405,067 | | 301,837 |
| | | | | |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ | 1,038,185 | $ | 538,173 |

42.     On February 1, 2018, Aceto issued a press release titled "Aceto Reports Fiscal 2018 Second Quarter Results," which announced the Company's financial and operating results for the quarter ended December 31, 2017.  The press release stated in relevant part:

Fiscal 2018 Guidance

For the fiscal year ending June 30, 2018, at current exchange rates, ACETO is providing financial guidance as follows:

- Total revenues to increase approximately 10% to 15%;

- Reported diluted GAAP loss per share between $(0.22) and $(0.32); Diluted Non-GAAP earnings per share between $1.00 and $1.05.

- The Company's fiscal 2018 financial guidance is based in part on the following assumptions:

- Generic industry headwinds continued in our second fiscal quarter and we are expecting annual price erosion in the low double digits percentage;

- Reported diluted GAAP loss per share includes an additional tax expense of $0.39 related to the TCJA

- R&D expense of approximately $9.0 million; and

- Total generic product launches of 15 to 20.

43.     On February 2, 2018, Aceto filed a Quarterly Report on Form 10-Q with the SEC, in which the Company reported its financial and operating results for the quarter ended December 31, 2017 ("Q2 2018 10-Q").  For the quarter, Aceto reported a net loss of $13.86 million, or $0.39 per diluted share, on revenue of $171.23 million, compared to a net loss of $560,000, or $0.02 per diluted share, on revenue of $125.55 million for the same period in the prior year.

44.     The Q2 2018 10-Q contained signed certifications pursuant to SOX by Kennally and Roth, that stated, in relevant part, that the Q2 2018 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect

to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report."

45.     On the same day, February 2, 2018, Aceto held an earnings conference call with investors and analysts to discuss the Q2 2018.  During the conference call, Kennally stated:

> [W]e expect net sales growth of 10% to 15% with Pharmaceutical Ingredients accounting for more than half of the revision, reported GAAP earnings per share to be in the range of a loss of $0.22 to $0.32, and diluted non-GAAP earnings per share to be between $1 and $1.05.

> Our results for the second half of fiscal 2018 are expected to be modestly better than the first half of the year.  And regarding R&D, we now anticipate spending approximately $9 million in fiscal 2018 for our finished dose generics pipeline versus the previous expectation of $10 million. And just as a reminder, our R&D expenditures are milestone-based.

46.     The statements referenced in ¶¶ 36-45 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that:  (i) due to undisclosed competitive and pricing pressures, Aceto was unlikely to meet the performance metrics the Company provided to its investors as financial guidance; (ii) the Company lacked effective internal control over financial reporting; (iii) accordingly, Aceto's financial guidance was overstated; and (iv) as a result of the foregoing, Aceto's financial statements and  the Individual Defendants' statements about Aceto's business, operations, and prospects, were materially false and misleading at all relevant times.

**C.    The Truth Begins to Emerge**

47.    On April 18, 2018, after the market closed, Aceto issued a press release entitled "Aceto Board Takes Proactive Steps to Address Business and Financial Challenges," which disclosed that "the financial guidance issued on February 1, 2018, should no longer be relied upon," and suspended "further financial guidance for at least the balance of the fiscal year."  The press release stated:

> PORT WASHINGTON, N.Y., April 18, 2018 (GLOBE NEWSWIRE) – ACETO Corporation (Nasdaq: ACET), an international company engaged in the development, marketing, sale and distribution of Human Health products, Pharmaceutical Ingredients and Performance Chemicals, announced, in light of the persistent adverse conditions in the generics market, it is negotiating with its bank lenders a waiver of its credit agreement with respect to its total net leverage and debt service coverage financial covenants in the fiscal third quarter, and that *the financial guidance issued on February 1, 2018, should no longer be relied upon. In addition, the Company anticipates recording non-cash intangible asset impairment charges, including goodwill, in the range of $230 million to $260 million on certain currently marketed and pipeline generic products as a result of continued intense competitive and pricing pressures.*
>
> Al Eilender, Chairman, said, "Given continued headwinds in the generics market, the Board has taken decisive action by bolstering the Company's senior leadership, engaging in proactive discussions with its secured lenders, and initiating a thorough evaluation of strategic alternatives.  The Board looks forward to working with and supporting management throughout this process and appreciates the continued dedication of its employees and other stakeholders while it navigates this difficult industry environment."
>
> The Board announced the appointment of Rebecca Roof as Interim CFO and the *resignation of CFO Edward Borkowski*, who has decided to pursue another opportunity. Ms. Roof is a highly experienced finance professional and a Managing Director at AlixPartners LLP.  While at AlixPartners, Ms. Roof has served as Interim Chief Financial Officer of the Eastman Kodak Company, Atkins Nutritionals, Anchor Glass Corporation, Fleming Foods, and several privately held entities. Her pharmaceutical and specialty chemicals experience includes leadership roles at Taro Pharmaceuticals and LyondellBasell, also while at AlixPartners.

(Emphasis added.)

48.     Aceto additionally announced that it was negotiating with its lenders for a waiver of its credit agreement regarding certain of its financial covenants due to adverse conditions in the generics market.  To that end, the Company announced that "to provide appropriate assurances to its lenders, to fortify the balance sheet and to preserve the Company's liquidity position, the Board anticipates a significant reduction of the Company's dividend going forward."

49.     In a case of too little too late, the Company additionally disclosed that as a result of the news on April 18, 2018, it had hired financial advisor PJT Partners and legal counsel to assist in a strategic review process of its business.  The Company announced that strategic alternatives could include "the sale of a key business segment(s), a merger or other business combination with another party, continuing as a standalone entity or other potential alternatives."

50.     On this news, Aceto's share price fell $4.74 per share, or 64%, to close at $2.66 per share on April 19, 2018.

51.     On May 3, 2018, Aceto issued a press release announcing its financial results for the fiscal 2018 third quarter ended March 31, 2018, results which evidenced the true state of the Company.  The third quarter results were as follows:

**<u>Third Quarter Fiscal 2018 versus Third Quarter Fiscal 2017</u>**

- Net sales of $186.0 million versus $190.1 million, a 2.2% decrease

- Gross profit of $27.7 million versus $42.3 million, a 34.6% decrease

- **Net loss of $196.6 million, or $5.57 per share, including previously-announced pre-tax non-cash asset impairment charges totaling $256.3 million, versus net income of $5.6 million, or $0.16 per share**

- **Non-GAAP Adjusted Net Income of $0.2 million versus $13.6 million, a 98.2% decrease**

- **Non-GAAP Adjusted EPS of $0.01 versus $0.39, a 97.4% decrease**

(Emphasis added.)

52.     On September 13, 2018, instead of filing its Form 10-K with the SEC, the Company

filed a Form 12b-25 Notification of Late Filing.  The reason given for the late filing was that the

Company "has encountered a delay in completing the financial statements for the fiscal year ended

June 30, 2018."  The Notification of Late Filing went on to state:

> As described in Part III, the ongoing analysis of whether an additional allowance is
> required for the Registrant's $76.5 million net domestic deferred tax assets remains
> in process.  If the Registrant determines that no additional deferred tax valuation
> allowance is required to be taken, the Registrant expects to record a net loss for the
> year ended June 30, 2018 of approximately $240 million (or approximately $6.80
> per diluted share), reflecting a net loss for the Registrant's fourth quarter ended
> June 30, 2018 of approximately $30 million (or approximately $0.84 per fully
> diluted share).  Results for both the three and twelve months ended June 30, 2018
> reflect the fact that the Company's net sales and gross profit were negatively
> impacted by sustained generic industry headwinds and higher-than-expected failure
> to supply penalties at the Registrant's Rising business segment.  The Registrant's
> results also reflect substantial expenses incurred by the Registrant to address the
> issues that led to the above-mentioned impairment charges taken as of March 31,
> 2018.
>
> As noted above, the Registrant is currently assessing whether it will be necessary
> to increase its valuation allowance with respect to some or all of its approximate
> $76.5 million in net domestic deferred tax assets.  To the extent that additional
> allowances are taken, the Registrant's net loss for the year ended June 30, 2018 will
> increase over the net loss of approximately $240 million that will be recorded if no
> additional tax reserves are taken.

53.     Thus, in a matter of months, Aceto went from a guidance of a loss per diluted share

between $(0.22) and $(0.32) for the fiscal year ended June 30, 2018 to a loss of approximately

$6.80 per diluted share, or an increase of over 2,000%.

## DAMAGES TO ACETO

54.     As a result of the Individual Defendants' wrongful conduct, Aceto disseminated

false and misleading statements and omitted material information to make such statements not

false and misleading when made.  The improper statements have devastated Aceto's credibility.

Aceto has been, and will continue to be, severely damaged and injured by the Individual

Defendants' misconduct.

55.     Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Aceto to two lawsuits for violations of the federal securities laws pending in this Court, captioned *Mulligan v. ACETO Corporation et al*, No. 18cv2425 and *Yang v. ACETO Corporation et al*, Case No. 18cv2437 (collectively, the "Securities Class Actions").

56.     Thus, as a result of the Individual Defendants' misconduct, Aceto has sustained damages, including, but not limited to, (1) costs incurred from having to defend and possibly settle the Securities Class Actions; and (2) costs incurred from the strategic review process the Company is undergoing.

57.     Moreover, as a direct and proximate result of the Individual Defendants' actions as alleged above, Aceto's market capitalization has been substantially damaged, losing tens of millions of dollars in value as a result of the conduct described herein.

58.     Finally, these actions have irreparably damaged Aceto's corporate image and goodwill.  For at least the foreseeable future, Aceto will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Aceto's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

59.     Plaintiff brings this action derivatively for the benefit of the Company to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties.

60.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

61.     Plaintiff is an owner of Aceto common stock and was an owner of Aceto common stock at all times relevant hereto.

62.     At the time this action was commenced, the Board consisted of the seven Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

## A.     Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability

63.     The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

64.     Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Aceto.

65.     The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were

being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties have resulted in the Director Defendants facing a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Aceto to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile.

**B.    Defendants Britton, Levin, and Yarosh as Audit Committee Members are not Disinterested as They Face a Substantial Likelihood of Liability**

66.    Defendants Britton, Levin, and Yarosh were members of the Audit Committee at the time of the improper statements detailed herein.  Pursuant to the Audit Committee's Charter, the members of the Audit Committee were and are responsible for reviewing the Company's financial reports, the Company's business and financial risk management practices, the Company's legal and regulatory compliance, and reviewing the integrity of the Company's financial statements and internal controls.  Notably, in performing these duties, Defendants Britton, Levin, and Yarosh were required to discuss with management and the Company's independent auditor the annual financial statements, including the disclosures in management's discussion and analysis.

67.    Defendants Britton, Levin, and Yarosh were required to discuss with management and the Company's independent auditor filings with the SEC before they were filed.  Defendants Britton, Levin and Yarosh also were required to discuss with management the Company's major financial risk exposures which would include "certain currently marketed and pipeline generic products as a result of continued intense competitive and pricing pressures."  Defendants Britton, Levin, and Yarosh breached their fiduciary duties by allowing the Company to make the improper statements discussed above.  Defendants Britton, Levin, and Yarosh each face a substantial

likelihood of liability for their breaches of fiduciary duties, and, therefore, any demand upon them is futile.

**C.    Defendant Kennally Lacks Independence**

68.    Defendant Kennally is not independent for purposes of demand futility because his principal occupation is CEO and President of Aceto.   He became the Company's CEO and President on October 2, 2017.   Defendant Kennally is compensated in accordance with the following arrangements per the Company's October 20, 2017 Proxy Statement ("2017 Proxy"):

- Mr. Kennally's initial base salary will be $650,000 per annum.

- During his employment, Mr. Kennally will be eligible to participate in our annual performance award program as in effect from time to time. Mr. Kennally's target performance award will be 100% of base salary, pro-rated for the remainder of the fiscal year ending June 30, 2018. The achievement of the performance award for each fiscal year, if any, will be based on company performance and Mr. Kennally's performance for the relevant year.

- In accordance with the terms of our 2015 Equity Participation Plan, for the fiscal year ending June 30, 2018, Mr. Kennally was awarded on October 2, 2017, (i) 60,000 shares of restricted stock, vesting in three equal installments on each of September 1, 2018, September 1, 2019, and September 1, 2020, and (ii) 35,000 restricted stock units subject to vesting if certain performance metrics are met during a performance period that ends on June 30, 2020.

- During his employment, upon satisfying certain applicable eligibility conditions, Mr. Kennally will be entitled to participate in a benefit package generally available to the Company's executives, consisting of health insurance, life insurance, participation in a 401(k) plan, a Supplemental Executive Retirement Plan and a Flex Spending Plan, and the use of an automobile in accordance with our automobile policy.

- The Agreement provides for "at-will" employment subject to termination by either party pursuant to the terms of the Agreement. In the event of Mr. Kennally's voluntary resignation, Mr. Kennally is required to deliver at least thirty (30) days' prior written notice to the Company.

- If the Company terminates Mr. Kennally's employment other than for cause pursuant to the Agreement, the Company will be required to continue to pay Mr. Kennally's base salary, at the rate then in effect, for the fifteen-month

period following the date of termination, subject to offset by any amounts earned by Mr. Kennally through other employment or consultancy during the fifteen (15) month period.

69.     In addition, Defendant Kennally is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the *Yang* Securities Class Action.

## D.     Defendant Kavuru Lacks Independence

70.     Defendant Kavuru lacks independence because of his longstanding relationship with the Company.  Kavuru has engaged in multiple related party transactions with the Company and thus is unable to consider a demand against the Director Defendants because to do so would impact his livelihood.  The multiple related party transactions involving Kavuru the Director Defendants have sanctioned are listed in the 2017 Proxy as follows:

During fiscal 2017, Rising Health and Acetris Health incurred costs of $1,865,000 and $165,000, respectively, payable to Lucid and Citron, respectively, related to consulting services provided by former Citron and Lucid employees.  These amounts are payable pursuant to a transition services agreement entered into at the time of the Company's Product Purchase Agreement.  Vimal Kavuru, one of our directors, is a principal equity owner and executive officer of entities that own, directly or indirectly, Citron and Lucid.

In September 2017, Rising commenced leasing approximately 125,000 gross square feet of warehouse space in Somerset, New Jersey.  This building is owned by an affiliate of Mr. Kavuru.  From the closing under the Product Purchase Agreement until September 30, 2017, Rising was charged $76,533 for rent and other expenses incurred in connection with this lease.

On November 2, 2016, the Company, Citron and Cronus Research Labs Private Limited, a research and development company headquartered in India that is affiliated with Vimal Kavuru ("Cronus"), entered into two amended and restated joint development agreements pursuant to which Cronus has been engaged to develop a portfolio of nine pipeline products ("Development Agreement I") and certain other products ("Development Agreement II" and together with Development Agreement I, the "Development Agreements") on behalf of Citron. Under the terms of Development Agreement I, Cronus has agreed to pay the first $3,500,000 of the development costs incurred after December 21, 2016, and 50% of any development costs incurred above that threshold in exchange for obtaining reimbursement for its costs funded out of the profits earned, if any, from the

pipeline products that are commercially launched, and a specified portion of the profits from those products thereafter. Under the terms of Development Agreement II, Cronus has agreed to pay the development costs for the products covered thereby in exchange for obtaining reimbursement for its costs funded out of the profits earned, if any, from such products that are commercially launched (subject to a $1,445,000 maximum), and a specified portion of the profits from those products thereafter.

At the closing under the Asset Purchase Agreement, we paid a total of $270 million in cash consideration to the Sellers.

## COUNT I

### Breach of Fiduciary Duty
### Against the Individual Defendants

71.     Plaintiff realleges in this Count every allegation set forth above.

72.     The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligations of good faith, fair dealing, loyalty, and due care.

73.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by knowingly causing and/or recklessly allowing the Company to make false and misleading statements regarding the Company's financial condition and prospects and/or failed to disclose that the Company did not have adequate internal controls in place.

74.     Moreover, the Individual Defendants willfully ignored the obvious problems with the Company's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

75.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Aceto has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

76.     Plaintiff, on behalf of Aceto, has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action for which demand is excused;

B.      Awarding against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 17, 2018                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**


  _/s/ Shannon L. Hopkins_____
Shannon L. Hopkins (SH-1887)
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Telephone:  (203) 992-4523
Facsimile:  (212) 363-7171
Email:  shopkins@zlk.com

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato (MF-7182)
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone:  (212)308-5858
Facsimile:  (212) 846-0462
Email:  fortunato@bespc.com

**VERIFICATION**

I, Joseph Mun, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

Print Name: Joseph Mun                    Date: 10/14/2018